versus Jones whenever the lawyers are ready. Good morning, Your Honor. May it please the Court. Reasonable police chief in the position of Sheriff Jones would not have understood that it violated the First Amendment for him to terminate a subordinate officer for unauthorized disclosure of confidential information and false accusations of misconduct leveled at the chain of command of the office. Indeed, this Court's precedents and precedents of other courts hold the opposite. This Court's decision in Jergensen establishes that where a police chief terminates an officer for an admitted or found violation of a general order prohibiting disclosure of confidential internal documents, that the termination of the officer does not violate the First Amendment. And indeed, that independent reason for terminating the officer eliminates the Mount Healthy but for causation test and whether or not the speech is a matter of public concern. But in this case, oh, and also the 11th Circuit has held that a police chief reasonably refuses to tolerate false accusations of misconduct leveled at the chain of command. Those are detrimental to esprit de corps. They damage the reputations of the individual officers. And they impair the mission of the organization. So a reasonable... You know, I think all those are fine general principles. Unfortunately, you have to deal with the record in this case, the facts of this case, and the jury verdict in this case. Yes, Your Honor. And moving directly to the jury verdict, the jury verdict does not bear on the question of qualified immunity. Well, of course it does. The jury found the facts. Well, what the jury was asked to determine was whether disclosure of the speech at issue was a contributing factor or substantial factor in the termination of the officer. And as I just said, this court has... Steve, but you want to segregate... And I have a lot of sympathy. I have to tell you. I represented the state of Maryland a long time. I have a lot of sympathy with the state here, but I'm not sure about the way the state handled this case. Because what we have here, according to the plaintiff, was corruption in the police offices. And it was that corruption that he was making public. So the cases you're relying on aren't that. I mean, you have to take what the jury said about the corruption. But the jury didn't make a... At least in the absence of some plain instructional error. Right. But no, Your Honor, the jury didn't make a finding. The jury couldn't have found for him otherwise. Yes, the jury could have, Your Honor, under the instructions of the court. Because what the court instructed the jury was that pages one to three of this document were protected speech. But what the question of law for this court determined, to determine, is were they protected speech? And the facts of this case show that they were not protected speech. And the reason is that this was a three... This was three of four pages of an internal memorandum that the deputy prepared as part of an internal grievance. And the allegations of corruption in the document were based solely on his own incorrect views of Maryland law. That's the component where he said that there was false charges being leveled against Mr. Pitts. And then the other part of it was that he was claiming that there was a suppression of facts relating to the arrest, and that was simply untrue. Well, you're... He says it's true. No, Your Honor. A lot of people said it wasn't true. He testified... He said he was required to redo his report three times. He testified... And he has three earlier reports, or two earlier reports. He testified at trial, Your Honor, that his total allegation of falsity was based on the But if you move information to where it is hurtful... I mean, I think that the state could have made the case, but never did, that the agency was trying to... The sheriff was trying to protect the officer here by not having a cause of action brought against him. But they never... He never made that argument. And I don't know that that would have succeeded with a jury, but it might have. The... Deputy Durham testified at trial, and that's at the Joint Appendix at 249, that the claim of falsity was simply that he moved it from one report to another, but it wasn't deleted from the record, and that the reason that the deputy objected to moving it was because he wanted it to cover him, that he objected to deleted follow-up reports, which just dealt with his own reporting activities. He wanted to keep a paper trail to protect himself. And this was all part of his grievance against the officer, and that there was no information deleted from the official record. If you compare both reports, which are always maintained in the record of the sheriff's department, they were not deleted from the official record. They're there. All of the detail from the original police report is now in a report labeled use of force. And the deputy was directed... What was going to be revealed to the person that had been apprehended? Well, they're all part of the... They would have all been disclosable to him. So all three versions would be revealed to the person that was apprehended? There were only two versions. In the traffic accident? Yes, Your Honor. All three of them were revealed to him. Well, I don't know what was actually revealed to him. What was available to be revealed to him? They were available, yes, Your Honor. Okay, and there's no evidence in this record that those earlier versions were not available? No, Your Honor. Not at all. They are available. And the deputy was actually advised in writing that he was directed in writing, a JA-465, he was directed in writing to properly document your use of force on the proper form and to include your use of chemical spray and all physical force. That's a JA-465 in writing. He was advised to make a complete record of it. And he was advised if it's on the wrong report, put it on the correct report. And so there's no factual basis for his allegations of misconduct. The record is undisputed that it was all to secure an advantage in his grievance. He hadn't liked the way he was being questioned, and he hadn't liked the way that they were telling him to do his reports. He disagreed with the clear Maryland law on this, Parnell v. State, which is cited in our brief at page 15, identical activities of the arrestee, resisting arrest and assault, there's probable cause for. And so his claims are just incorrect. There's no evidence of them in this case. The evidence is undisputed that he wanted to do it his way, and the only misconduct was his. He falsely, he refused to follow directions. He revealed confidential information. It was all confidential. He admitted that he revealed confidential information. It all sounded like a jury argument. No, Your Honor. No, no. Please. I'm sorry. Slow down for all of us. Okay. You can say no, but I persist in my view that this sounds like a jury argument. That doesn't mean it's wrong or ineffective, but I would like to try to understand it. Yes, Your Honor. I apologize, Your Honor. What is the issue of fact that the district court never should have submitted to the jury for which there is either insufficient evidence or for which only one reasonable conclusion can be drawn so that your client is entitled to qualified immunity? Whether the internal grievance memorandum, which was at issue in this case, that he prepared on advice of counsel and submitted up the chain of command and that formed... That's at 392, correct? Yes, Your Honor. Okay. That whether his disclosure of that internal document, that the judge advised him it was protected speech, whether that was a substantial factor in his termination, that's what the jury decided. Well, wait a minute. You say it's not protected speech? Yes, Your Honor. So that's a question of law that you're asking us to review. Yes, Your Honor. All right. So if we agree with the district court that it is protected speech, then what's your fallback position or your next position? That it still shouldn't have been submitted to the jury because under this... It should not have been submitted. Yes, Your Honor. That the issue should not have been submitted. Yes, Your Honor. Because... Because under this court's decision in Jurgensen, the disclosure of confidential internal documents is an independent reason for termination and that even if it is protected speech, the employer is entitled to terminate an employee for disclosing confidential information because no employee has the right to do so. So even if the sheriff acted under a mixed motive, your submission is he wins. Yes. Sheriff wins as a matter of law. Yes, Your Honor. Under Jurgensen. Under Jurgensen. Yes, Your Honor. Okay. And how does Jurgensen compel that outcome? Because in Jurgensen, the same thing occurred. The employee disclosed a confidential document to a Washington Post reporter and... Was it about pervasive corruption in the department? No, Your Honor. What was it about? But that's the whole claim here. Well, that's... I'm going back to Judge Motz's point. Yes, Your Honor. What was the claim in Jurgensen? In that, it dealt with an audit of the internal operation of the police department. So it was not about corruption. So that's the prong about disclosure of confidential information. The corruption piece is analyzed under the fact that, as I was saying before, that there's actually no evidence of corruption because the allegations were false. The employee's allegations were false. See, that's when you fall into your jury argument. Well, let me rephrase. There's no evidence they were true because the employee admitted that as far as the suppression of information, he was really only objecting to moving from one report to another. And as far as charging an innocent person, Mr. Pitts, he was just incorrect under Maryland law. So the undisputed evidence in this case, there's just no evidence of corruption. The trial record is very... Well, I'm not sure I... The problem is that he said there was corruption and people sort of, juries and the Maryland court ultimately, people have found that there's something to do with this. But can I just go back to something you just said? I thought that you said that the disclosure of this, because this was confidential information, his disclosure of it was violative of Maryland law. Is that right? It violated the general orders. Uh-huh. I thought you told me just a few minutes ago that the information wasn't confidential, that anybody could see it. It was right there in the file. No, it would have been disclosable to a person of interest under the Public Information Act if the authorized, like the sheriff, had disclosed it. But it was not... What if the traffic victim had wanted it? That's what I asked you earlier. And you said, oh, no, it was right there in the file, anybody could see it. Oh, I just... What I meant was it wasn't suppressed, that it was... It was just as disclosable as it had been on the original report, I guess is what I was trying to say, Your Honor, is that it wasn't made more secret by being moved to a different report. It was just that any time there's use of force, it's required to be on the use of force report rather than on the police report, and that's all that they were requiring. Well, of course, there's an issue of fact about that. Well, there's no evidence... The plaintiff says that that's not the case, that he was told to put it on the report he put it on. He put the accurate report on the report he put it on, and then his supervisors got angry because they thought they were going to be sued, and they told him to redo the report and then put it on another piece of... Another report. Well, he... That's what his testimony is. But the documents don't... And you have to kind of take it now because you have a jury verdict in the best light for him. But the jury isn't asked... That testimony... The jury wasn't asked to make that determination. Sure. All that evidence was in front of them. He testified, didn't he? But that wasn't the issue before the jury. Well, that was all about his feeling that this was corruption. But the issue... Because he thought that this business about putting it on the correct report was just bologna, bologna, bologna, that they were making that up because they were worried about the sheriff's office being sued. Yes, Your Honor. I guess... I mean, that is his case. But I guess my answer to that, Your Honor, would be that the question of qualified immunity was for the court to determine, and the court should have made it, determined it, regardless of the jury's verdict. That it's a question of law for the court to determine before the issue goes to the jury. Well, it did determine it. It said he wasn't entitled to it. It was... Right. So the problem is not that he didn't determine it. Yes, Your Honor. It's a matter of law. He disagreed with how the court determined it. Yes, Your Honor. And the question for this court is, as a matter of law, was the district judge incorrect in making that determination? Okay. Well, so maybe we could talk about the elements of a First Amendment violation. Yes, Your Honor. Maybe that would be more fruitful for you than... Certainly. ...argue the facts. And the first... Of course, the first thing is whether the employee's speech is protected. And in determining whether it's protected, again, in this... But he's speaking on a matter of public concern. Yes, Your Honor. And the reason... And while generally speaking, corruption is a matter of public concern, when you look at the basis for the employee, the undisputed evidence on the basis for the employee's allegation, it dealt with the fact that information was moved from one report to another, and he had... Mr. Pitts was innocent of the crimes that the employer wanted him to charge him with, but under Purnell, there's no basis for concluding that he was innocent. The facts reported by Deputy Durham showed that there was probable cause for each of those charges under Maryland law. The facts of Purnell are on all fours with that. So, in order for it to be a matter of public concern, it... The speaker has to be accurate and precise? I don't... Where do you get that? Yeah. Well, the question is whether it was false or not. I mean, if there really is no corruption, and it's really just the employee's mistake or it's untrue... Then you are arguing, in order to be a matter of public concern, the speech has to be accurate in all respects. I don't read that in Supreme Court law. No, I don't mean that at all, Your Honor. But I think you have to look at it from the... You were dealing with qualified immunity, and the sheriff did an investigation... Well, we were first... I thought we were going to go through the First Amendment element. I'm sorry, Your Honor. No? No, Your Honor. Yes, Your Honor. Because we have to decide whether this is clearly... Yes. First of all, we have to find if there's a violation. Yes, Your Honor. And then whether it's clearly established or not. Certainly. So you keep talking qualified immunity. Well, the first element in qualified immunity is whether there's a constitutional violation. Yes, Your Honor. And the assertion here is that there's a First Amendment violation. Yes, Your Honor. So, as I understand it, if you do have protected activity, you still... You, the employer, could still win. Yes, Your Honor, because... But your witness, the sheriff, said there'd been no interference. He couldn't point to anything that had happened. So he hasn't put anything on the balancing scale his way. But, Your Honor, under Waters v. Churchill and under this Court's president, it's not whether there was actually disruption. It's whether, at the time of the termination, the employer could have reasonably concluded that there was a potential for disruption. Does he testify that he thought at the time there was potential, but he now decided that there wasn't? I didn't read his testimony to say that either. And I read everything in this record. Well, Your Honor, at the time he terminated him, he cited the fact that he had disclosed confidential information. Violated his trust. And violated his trust. And then he later testified that it hurt morale in the office and that, you know, it took up a lot of time. And he really didn't have anything to say about that. The record is startling, I think. In the lack. Yes, Your Honor. But again, this Court's precedents and the Supreme Court have made clear that it's the potential that the Court views as a matter of law. We can't make it up, which is what your brief tries to do. We can't just say it's a matter of law. We can't just talk about general principles about what could be the disturbance. We need some evidence. And we don't have any in this record. Yes, Your Honor. But, I mean, as the Ola Dende case pointed out, which is cited in the brief, that when you have false allegations of misconduct against officers, that a reasonable belief chief can conclude that there's a potential for disruption and it damages his free decor. Who has concluded that the allegations were false? Pardon me, Your Honor? What court has concluded that the allegations were false? No court, Your Honor. But again, you look at the reasonable... He did his own investigation, as Waters says he's entitled to do, and he looked at the evidence, and I think it's the Joint Appendix 422, as a result of his investigation, and he concluded that the employees' allegations of misconduct by the superior officers were false. And under Waters, the court is... The employer's entitled to make that determination. He's entitled to reasonably rely on his investigation, and he did so. And so, from his perspective, which is what the court examines at the time of the innocence, the sheriff wasn't involved in... Okay, I think your time has expired. Well past. I'm sorry, Your Honor. But you had some time for rebuttal. Oh, okay. Thank you, Your Honor. Mr. Hoffman, the state's principal argument seems to me that all of these allegations were false. And so, do we have... What do you say with respect to that? They were true. Well, who says what? Your client says they're true. Their client says they're false. Well, what we do know about this... Let's start, if we could, with a statement. The statement that forms the basis of the speech was that Mr. Durham had requested an immediate full investigation, that the Detective Sergeant Miles had ordered Mr. Durham to change his report and delete follow-up reports, or Mr. Durham would be charged or suspended. All of this has not been contested. The sheriff put on no case whatsoever. So these claims of falsity are kind of made up from whole cloth. As I understand it, their argument is, as a matter of law,  It was just wrong on that. And therefore, all his speech about that activity is not protected. Well, he has quite a bit of speech, including speech about the grievance, his grievance being returned from the county commissioners back to the sheriff himself to investigate. That's not wrong. But with respect to... I think the meat of this here is that Mr. Durham complained that he was being told to put an assault charge on Mr. Pitts, the traffic offender. And, in fact, Mr. Durham testified at trial, they told me that they're going to either arrest me unless I do Mr. Pitts. So I either do him or they're going to do me. I'm sorry, was it assault or resisting arrest, or both? Actually both. Because they had to tussle. Mr. Durham... What's wrong with that? Well, if you go back to the facts of the case, what Mr. Durham did was there was a speeding motorcyclist named John Pitts, I believe it was, who was fleeing a Maryland state trooper. Mr. Durham, who was at the time a deputy sheriff for the Somerset County Sheriff's Office, just happened to be at the right place at the right time. Motorcycle sped by. Mr. Durham joined the chase. Mr. Durham got to the motorcycle. The motorcyclist ends up trying to cross a lawn and ditch his bike or whatever, pushing his bike along. Mr. Durham actually happens to get to the motorcyclist first. Before the trooper. Before the trooper. The trooper's running across the lawn. Mr. Durham gets to the motorcyclist. The motorcyclist is literally trying to push his motorcycle, as I understand it, trying to push his motorcycle away. Mr. Durham then tries to detain, to stop, this gentleman who's trying to still flee. And this gentleman does not want to stop. Mr. Durham. What does he do? What does he do? Mr. Durham administers. Not the officer. Okay. Fleeing suspect. Okay. What does he do to demonstrate his not wanting to be arrested? As I understand it, there was a certain like, he certainly, he just simply wouldn't. He physically resisted, didn't he? He wouldn't comply with requests, for example, to put both of his hands behind his back. And it was Trooper Morton, the Maryland State Trooper, who actually grabbed the second arm. Mr. Durham could not get both arms behind his back and could not get him to, in essence, comply. But at no time, and also Mr. Pitts was trying to get up off the ground, trying to raise his body off the ground, and Mr. Durham was trying to hold him down to the ground to detain him. So Trooper Morton. I think it would be good to get to what Mr. Pitts, what your client did do. Yeah. Okay. What Mr. Durham did do was in order to hold the suspect, he administered, I believe, two forearm blows underneath the nose and also some knee strikes to the side and also O.C. spray, which is. And he put all that in his first report. Uh-huh. He put it, that's exactly what he did. He put it all in his first investigative report. And then what happened? And that was, if I could say, per his sergeant's instruction. Sergeant Williams testified at trial that that use of force should go in the investigative report. Then one of Mr. Durham's supervisors comes in and urges him to go seek medical help and informs Mr. Durham that the suspect was going to the hospital and claiming injuries from the police encounter. So we need to protect ourselves from a potential claim. So we need you to go to the hospital. Absolutely. And claim injury. Absolutely. And we need you to revise your report. Absolutely. And put it on this form where it should have been to begin with. Absolutely. Oh, no, no, no. You're skipping a part. The point is this, it seems to me, in this case, is the way this guy, the suspect, looks, looks like somebody beat the crap out of him. Right. Either if you did this, we assume as an officer of the law you did it because it was necessary. All right, let's take it his side, an incident report. But if you did this to this level, he must have been doing something that violated the law, whether it was obstruction of justice, resisting arrest. So basically what they're saying to him is that, okay, you said that happened. But you tell me there's nothing that he did that violated the law? That's what they were saying. What they're saying is take your use of force out of your first investigative report and delete your follow-up reports, which included discussions between Mr. Durham and his supervisors about, oh, you might want to go get yourself checked out and other sorts of things. They were offended that what they were trying to do was trying to posture in order to avoid a potential claim brought by this motorist. Mr. Durham explained at trial, and obviously the jury took stock in this, that couldn't be the case because there were troopers right there to see what he did. It wasn't like he was by himself, and if it didn't exist in his report, then it would go away except for the suspect. The troopers saw what happened. So anybody would say, yes, rightly or wrongly, those blows were administered by this officer. So he wouldn't go away just because he didn't put it in his incident report under these facts. What Mr. Durham... Let me say that. What Mr. Durham... What he was asked to do was not just delete and alter his initial reports, but also to charge the suspect. Exactly, because he ought to be charged if a man looks like this. If he looks like this going to the hospital, then he better have been doing something that violated the law. That's a reasonable... If I was his watch sergeant, I would say the same thing. You better have some reason why you beat the crap out of a man like that, and you're telling me, oh, no, it's not even a charge against him. Why is there not a natural police follow-up to this incident? Well, first of all, Mr. Pitts never ultimately made any kind of complaints. I'm sorry, I understand, but could you answer Judge Gregory's last question? Why isn't it appropriate for a police supervisor who reads a report and draws the inference that surely the defendant must have done something and my officer, my deputy, has left something out of his report? Complete your report, Mr. Deputy. Right, and... You don't contend that that's inappropriate, right? Well, let me back up, because I do think we're missing something. Mr. Durham, when he first got back from the station from this altercation with Mr. Pitts, did speak with Sergeant Paul Williams, and Sergeant Paul Williams hands him the form, the taser form that is discussed in the... No, I'm sorry. I think we're trying to focus on the propriety of a supervisory officer who instructs his or her subordinate, you left something out of your report. And indeed, bigger than that, you have failed to place a charge against a citizen where there's every reason to believe you should have. Okay, there's... As a general principle, there's nothing wrong with a supervisor saying that. Okay, so why is that different from this case, I think is what we're trying to hear. Because there's an absolute... There's an absolute absence of any evidence that Mr. Pitts actually assaulted Mr. Durham, for one. Two... But Judge Gregory's point is that the inference drawn from the use of force might reasonably suggest to a supervisory law enforcement officer that her subordinate has failed to place a charge that is reasonably available to be placed. Okay, what... Okay. I'll explain how Mr. Durham testified at trial. I think I can answer your question. He said he did not charge him with resisting arrest because it wasn't his arrest. Trooper Morton ended up putting ten charges against Mr. Pitts. That's how he explained it at trial. That's in the record. Two, how he explained... With respect to not charging Mr. Pitts with an assault, he explained at trial that Mr. Pitts did not assault him. Mr. Pitts tried to... Mr. Pitts tried to get up off the ground and he wouldn't allow himself to be stopped and detained in order for Trooper Morton to arrest. Did Morton charge Pitts with assaulting Morton or assaulting Durham? That's not in the record, Your Honor. That is not something that... But you say he did charge him with assault. Trooper Morton, as I understand it, charged Mr. Pitts... With assault. I don't know the specific charges. You don't know the specific charges. Okay, look, you just conceded that as a general matter it would be all right for a supervisor to say to a deputy or an underling that let's make your report accurate, let's do the charges. So why wasn't that okay here? I understand he thought it wasn't okay and he apparently has persuaded a jury it wasn't okay. Because this dispute simply is not about a supervisor trying to get an officer to correct their forms. Yes, it is. He says that that's all fraud and that that's the fraud that he exposed. And that's right, and it forms the basis of his speech. So what we have here is an underling saying his judgment is better than his supervisor's and he can go tell the press about it and therefore make a First Amendment claim just when he disagrees. One of my law clerks decides to disagree with me. They think that their view is better. They can go send it to the Washington Post and make a First Amendment claim? Well, then you'd have to evaluate the public concern and the disruption that that might bring to the court. But the problem, this is not a case where there's out of whole cloth they want him to charge somebody something that didn't exist at all. You must concede that that's a natural follow-up to say you can't have this level of force being exhibited and not have a counterbalance of a charge. In a sense, that's what Counselor said. It's almost like using leverage. I disagree with you, so I'm going to make your request, which seems to be reasonable, into a smoking gun of fraud. You want me to put in a report where there's no factual basis that suggests I should bring a charge. But clearly it would suggest a charge unless you were saying I'm a rogue police officer, which we know is not the case. Nobody has ever suggested that in this case. That's why I presume the highest level for the officer involved, your client, therefore that's why it begs the question of saying I know they must have done something because he wouldn't be presented to the hospital like this. And that seems to be reasonable. As Judge Moss said, just because he disagreed with that doesn't mean you now can go out and turn what otherwise would be a grievance matter into a cause célèbre for your benefit, and then a jury believes it. That's why we have to look at reasonable under the circumstances to get from under the protection of qualified immunity. Well, there's two things that form kind of the basis of the speech. One is the falsifying or altering of the police reports and the demanding that Mr. Pitts be charged with assault or Durham be charged. That's right, because if you don't have any basis for doing this, then that's excessive force and may be criminal. Okay, so that's one. That's one. Secondly, your honors, the grievance that was filed, which is at Joint Appendix 390, is different than the actual speech. The internal grievance is at 390. The speech is at 398. And what that speech included was that after he filed the internal grievance, Somerset County suspended him and sent the investigation, his grievance against the sheriff, back to the sheriff himself to investigate, which is a great public concern based on the conflict of interest. But the problem is that the risk is that it really has to be something that's appropriately disclosed, because otherwise it does go to the trustworthiness of the officer. Doesn't it? That he's disclosing documents that otherwise he shouldn't. Well, actually, what he disclosed in his communication and the attachments that went with it were that the sheriff testified that at 293, lines 14 through 17, he admitted that he didn't know what confidential information was allegedly sent out by Durham. That's at Joint Appendix 293, lines 14 through 17. You know, I appreciate you mentioning that when you say the sheriff testified, you're talking about the deposition testimony. No, I'm talking about the trial testimony. Oh, he did testify at the trial. The sheriff testified quite clearly at Joint Appendix 293 that he didn't know what confidential information that Durham had sent out and that he admitted that the information was accessible at 319. The sheriff admitted that some of the materials that Durham disseminated were accessible to citizens if they asked for them. He also admitted that there was no confidential police techniques or any confidential information given out by Durham. That's at 318, 319. I think that if we get to the balancing, you win. Right. So now we have to focus on the protected activity. Right, and I think that's where we were. Right, we were. So you win on balancing if you get by the protected activity. Okay. Now, there's been the suggestion that all we have here is a disagreement by your client with a personnel action. I mean, he decided his judgment about what happened here was better than his supervisor's. Again, because he sent that disagreement to a paper and charged fraud, in your view it turns into a matter of public concern. Well, I mean, the sheriff himself admitted that the public would be concerned about the possible filing of trumped-up criminal charges. That's one of the things that Mr. Durham states, that he thought that the assault charges on Mr. Pitts were not – there was not sufficient evidence of that. Mr. Durham testified that Mr. Pitts did not strike him or harm him in any way or harm his uniform or damage his vehicle or anything like that. So that – I have to say, I'm really perplexed that – maybe I shouldn't be, but you're not here able to tell us about the actual charges filed by the trooper? Well, what – You see, I'm really confused because clearly what happened here, nothing's clear, but the deputy regarded this as a Maryland State Police matter. All he did, as you put it so aptly, he was in the right place at the right time, he helped out this trooper, he hit the guy several times, he sprayed him, but it was the State Police's matter. And I asked you earlier, of course, was there an assault charge and who was the victim on that charge? So what seems to be going on is the sheriff is concerned, not with what charges have been placed against Pitts, because he's been charged by the agency with responsibility for the investigation and prosecution of the case. He – the sheriff – I thought what you were saying is the sheriff is trying to cover the sheriff's potential liability by asking the subordinate to do what the facts on the reports that the subordinate prepared seem to suggest. And so how do you get a matter of public concern out of that? Well, he's not just saying charge Mr. Pitts. He's saying delete your use of force. If your honors compare the original investigative report to what it became – I thought it was delete your use of force or charge the man. It's – no, it was delete your use of force or alter your use of force, put it on a different form, delete the three follow-up reports about them requesting Mr. Durham to go seek medical help, among other things, and then thirdly, charge Mr. Pitts with an assault. When you say delete the reports, you don't mean destroy the reports, or maybe you do. No, I do. Is that in the record? Destroy? It was – as I understand this record to be in the trial testimony, it was a punch a key, gone. But they had already been printed out. The only reason why they're even available in the joint appendix is because Mr. Durham had printed them out before he deleted them off the Somerset County Sheriff's Office's computers. So you're saying the supervisor reviewed them while they were still in cyberspace? He wanted them off the system's computers, correct. He wanted the follow-up reports of all the back and forth between Mr. Durham and the supervisors, the history, so to speak, gone, banished. In fact, Mr. Durham acknowledged that he had printed out copies of those materials. Acknowledged to whom? When? To his supervisors that he had – At what point in time? This would have been, I believe, late August or early September of 2008, and his supervisors, and this would be Sergeant Miles, threatened to initiate departmental charges against Mr. Durham for printing out the reports, the original follow-up reports, and simply providing his attorney a copy. With Judge Motz's permission, could you just spend 30 seconds and tell us what effect the Court of Special Appeals decision might or might not have on this case? Well, for one, the Court of Special Appeals said that the sheriff's decision to terminate was arbitrary and capricious. Right, so if he wants, he gets his job back. He's gotten his job back. Well, why don't I address that? Mr. Durham has been reinstated. Right. That is the thumbnail version. I could spend another hour and a half about what happened after he returned on September 17th. I'm sure it's not a happy, happy situation for anybody to consider. Well, he was on leave with pay for a whole year when this happened. So he didn't even work, and he got his pay. Then he's reinstated, and he's gotten more than a million dollars in damages. The state never asked for a remittitor, never said that we should count what we paid him against the verdict. It's really the most extraordinary case I think I've ever seen. I'm sorry, the damages began from the time when Durham was terminated in September 2009 when he went off their payroll. From September 2008 to September 2009, he was suspended with pay. Did the state ever ask for a remittitor? I'm sorry, the state did not ask for a remittitor. You're saying they weren't entitled to one because they paid him up until termination. Well, that's just the thing. That wouldn't deal with the remittitor. They may have had other arguments for remittitor, but they did not make them. I think this was too much damages for this offense. That would be the damage. That's the argument about remittitor. An economist testified. Part of the problem is that the jury's verdict was in May of 2012, and the Maryland Court of Special Appeals decision was in August of 2012. So there was no way for the economist to consider the possibility that Durham would actually be reinstated. Leave aside the reinstatement or not. Is that what it was, a $1.2 million verdict in these facts? That's correct. We have people that are beat up that don't get that much money. $412,000 in economic, $700,000 in non-economic, and that was based on the testimony by Mr. Durham as to what this did to his career and to his reputation and the distress that it caused him. He testified. His supervisor told me I was going to change my original police report and I was going to delete altogether my three prior reports, and if I did not comply, I would be charged departmentally and I would be charged criminally, which would mean arrested and charged. That's what he said. Okay. So that's your best evidence about what was going on. In other words, we've been asking you, and I'm not sure that we are all meeting, we're having a meeting of the minds here, but we've been saying, well, what's wrong with what his superiors did? And I guess your ultimate answer is that if all he has is a difference of opinion about what was involved in this arrest and what the appropriateness was putting stuff in his report, then you've conceded sort of in the abstract world it would be okay for his supervisors to overrule him, right? I would say this. At trial, you had two competing theories of this case. One, a disagreement among Durham and his supervisors. Two, a cover-up, an attempt to try to charge Mr. Pitts before he sued the department. At the time that this was going on, there was a case known as, it went to the Fourth Circuit, Henry v. Purnell. But he had already been charged. Not when they originally questioned him, isn't that right? The trooper charged him. No, but not right away, because all these ginning conversations took place right away, isn't that right? The same day. The conversations that occurred between Durham and his supervisors occurred over a number of days, but they began on August 21, 2008. Okay, there's a second conversation. The first conversation is fill out on this improper report, they say. He says they told him to fill it out. When is the next conversation? There's additional conversations leading up to an interrogation. When is the next conversation? The dates I'd have to pull from the appendix. How long after the event is the interrogation, what you call the interrogation? I believe it's like three or four days later. And hadn't Pitts been charged by then? Wasn't he charged the day he was detained and arrested? As I understand it, Mr. Pitts faced 10 different charges. You don't know when they were charged. I don't know when they were charged. There's no way he was released before he was presented to a commission. He was in the hospital, according to this record. The day of he left, that's correct, the day of he went to go to the hospital claiming injuries because he had had a problem with his shoulder. As I understand it, your economic loss calculus was based on his not having his job over a period of time in the future, right? Front pay. It included, that's right, moving into the future. Wow. And you mean to tell me that the state allowed that to happen without arguing that if we lose this case, at the very least, we're going to put him back to work? Right. They did. And it still gave out? How in the world could you get that? It's either one or the other. If you win, they're going to put you back to work. If you lose, you're not entitled to anything. But how can you get both of the best worlds? But you weren't seeking reinstatement here, were you? No, there was no reinstatement source for this particular case. You were seeking reinstatement in the state case. That's right. We were all together seeking. But really, what this all amounts to is a competing version of, was this about just getting the right form completed, which Mr. Durham testified it was not about, or is it about a cover-up? Is this about something else? And Mr. Durham reported that information, reported his version, reported his opinion to different government agencies and to members of the press as well as politicians. And this is an issue of public concern, whether or not a motorist who gets injured in a police encounter, who indicates he's going to the hospital, whether a department's posturing to protect itself from liability by then charging the suspect when the initiating police officer did not want to place those charges. Judge March was the lead judge. She's been absolutely generous to not only you but to the panel too. Let me follow up with this. I don't understand that. Your client takes the position, listen, I just happened to be there. It wasn't my arrest. But from an institutional standpoint, or it's more than that, you are the ones going to be responsible for what you did on that scene. And therefore, why is it not reasonable to follow up to make sure what seems to be a reasonable circumstance of bringing a charge? Why is that not done? You just don't have the cavalier to say, well, it wasn't my arrest, I'm stopping it. Why would his command say, no, you have to follow through with what he did? I hope it's clear enough. Mr. Durham did do what his supervisors told him to do. But then he told the papers about it and said it was corruption. Yeah. But we do have all of his testimony about, I think supervisors accused me of committing a crime and they strong-armed him and they put him in the room and they wouldn't let him talk to a lawyer. Is there any other questions? No. There are lots of questions. Anyway, I don't think you can help us anymore. Thank you. Thank you. Might I address the qualified immunity or would the court find some other, does the court have a question on some other aspect of the case before I address that? Whatever you want. I would... Go ahead. No, go ahead. I had the sense that you're better off now than you were when you sat down. And I'm really puzzled and beguiled by that. You... Is that what you were trying to say? I guess that's my question. That the real problem here is that... That this is not a matter of public concern as a matter of law because when it's objectively examined, your point is that as a matter of law, it is no more than a garden variety workplace dispute that has been elevated and magnified through some rather hyperbolic language about what was actually going on. Thank you, Your Honor. Yes, Your Honor, that is exactly the point the state is trying to make, that the district judge and this court examines the issue, and this court examines it de novo, whether it's a matter of public concern and the balancing. Now, you didn't file a motion to dismiss, correct? And I don't mean this as criticism. I mean, you didn't appeal from the denial of the motion. And you did file a motion for summary judgment. You did not file a motion for summary judgment. So, which is, again, not a criticism. In fact, if anything, I, for one, tend to criticize these interlocutory appeals more than most, I think. So you rested on your laurels in the sense that... I don't mean that as criticism, but basically you said we didn't get it on a 12b-6, we're going to get it on a Rule 50-A or a Rule 50-B. Yes, Your Honor. Okay. And that's basically where you are. And that's not to say that Sheriff Jones would have been entitled to summary judgment on the undisputed fact, but the trial record makes it even stronger because the employee himself testified that it was all in furtherance of his grievance and revealed his personal motive. Well, let me ask you, I quite take your point. In fact, as I say, I have some sympathy for this business about it. It was just a grievance. But his further testimony was that the employer was threatening him. And that strikes me... You know, wouldn't let him talk to a lawyer and told him that if he didn't do this, he was going to get shoved him in a room and wouldn't let him... And what are we to make of all that? Well, I think, again, we step back to the reasonable employer's viewpoint at the time, and he did conduct an investigation, and the sheriff. Remember, the sheriff was not personally involved in any of these activities, and he did conduct an investigation. Joint Appendix 422 is the result of his investigation. And he reasonably concluded from investigating what his chain of command was... what the chain of command in the office was telling him was that this had not happened, that the... He was... Rights were not denied, that there was no violation of the Law Enforcement Officer's Bill of Rights, which is applicable to this situation, and that it was in subordination of the employee and that he was refusing to fill out the proper form. But the conduct that the plaintiff alleges about his very adversarial questioning by his supervisors and being manhandled and not allowed to talk to his representative, I don't think there's really much question about that in the record. Well, he did say that, Your Honor. Yeah, and nobody testified to the contrary. No, Your Honor, but... So that's undisputed. But going back to the sheriff's investigation of that at the time, you have to go back... When the court looks at this, De Novo looks at the facts. But he's going and exposing that, if you will. I mean, that's... We're trying to decide whether that's... What he did, though, Your Honor, was in exposing it, he used confidential documents, and the sheriff, a reasonable person, the sheriff's position, what he knows is that he's disclosed confidential documents and that the sheriff's investigation has revealed that the allegations of corruption, misconduct, are false. And so, under Waters v. Churchill, the Supreme Court case, and this court's precedent, that the employer's entitled to make a reasonable... What are the confidential documents again? Well, the memo that's being now called a complaint letter is actually an internal grievance memorandum written on the advice of counsel. And what is confidential about that? But it's his own personnel record. Pardon me? It's his own personnel record. Yes, Your Honor, but that doesn't mean it's disclosable to the media or to outside agencies by the non-custodian. I mean, confidential records under the Public Information Act, as this court pointed out in Jurgensen, it's the employer who gets to decide whether to disclose them. An employee cannot disclose his own personnel records? Sure he can. He can't obtain them from the employer and disclose them. Without authorization. Right, in this circumstance, like he was himself a potential suspect of obsessive force himself. Yes, Your Honor. That's basically what it was. And he was found to have violated the disclosure requirements in the Law Enforcement Officer's Bill of Rights proceeding, and he admitted that he had, and he accepted a suspension. I mean, those facts are foreclosed to him now. He engaged in misconduct. Is it the case that the Court of Special Appeals decision found the termination improper but not the lesser recommended punishment? What the Court of Special Appeals decided was that when the sheriff imposed the greater penalty, he didn't state sufficient reasons for the record. That's all the Court of Special Appeals determined. But did they remand it for a do-over? No, Your Honor, they just remanded it, and he was reinstated. So could there have been a do-over? I believe there could have been, Your Honor, but there wasn't. I think probably the jury's verdict played some role in that at that point. There had been the other proceedings as well. But again, all I would ask the Court to do in conclusion is to look at the case from the viewpoint of the reasonable employer in the sheriff's situation at the time and that the trial record just further establishes that what he knew at the time, a reasonable employer would have concluded that he could terminate an employee for disclosing confidential information in violation of the general orders when he'd been found to have done so in the Leober proceeding, had admitted that he did so, admitted some punishment was appropriate. All the sheriff did was increase the punishment, as he's authorized to do under the statute. Unfortunately, he didn't state sufficient reasons for the record, so it was later reversed. Didn't state any reasons. Pardon me, Your Honor? It wasn't much of a hearing. I think you're on a little weak grounds when you get to the sheriff's hearing. But looking at his perspective at the time, he certainly wouldn't have reasonably concluded that it was clearly established that he was violating the First Amendment in merely increasing a penalty for admitted and found misconduct, and particularly when, based on his own investigation, the allegations of corruption and placing false charges on an innocent person were unfounded. And from his perspective, no precedent establishes that it's clearly established that an employer in that situation violates the First Amendment. Confidential information has been disclosed and false allegations have been made against the chain of command. Well, but if true allegations are made against the chain of command, no, there is no precedent that says that this isn't a matter of public concern. That's the problem. Yes, Your Honor, but there's no... Do we have his testimony about those allegations? But if you examine his testimony and look at why he believed they were false, you'll see that it's just based on his mistake of law, and Purnell establishes that, that pushing against an officer and resisting is resisting arrest. It doesn't matter which officer was trying to make the arrest. Do you know anything about the charges placed by the trooper? I understand we're outside the record, apparently. We are outside the record, Your Honor, and I don't know what the charges are, but I can tell that the record establishes that it was the state's attorney's view that it was up to the state trooper  on whether to charge with resisting arrest, so that's why the state's attorney was not pushing for Deputy Durham to follow. I just have much greater curiosity about things than most people, I guess. Yes, Your Honor. Okay, thank you very much. We'll ask the clerk to adjourn court, then come down and say hello to the lawyers. This honorable court stands adjourned until tomorrow morning at 9.30. God save the United States and this honorable court.
judges: Diana Gribbon Motz, Roger L. Gregory, Andre M. Davis